UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ADIL HIRAMANEK, et al., <br><br> Plaintiffs, <br><br> v. <br><br> L. MICHAEL CLARK, et al., <br><br> Defendants. | Case No. 5:13-cv-00228-RMW <br><br> **ORDER DENYING MOTION FOR NEW TRIAL AGAINST DEFENDANT MILLER** <br><br> Re: Dkt. No. 712 |

Following a four-day trial, the jury returned a verdict that pro se plaintiffs Roda and Adil Hiramanek had not proven that defendant Beth Miller illegally discriminated against them by denying them access to a restroom at the California Sixth District Court of Appeal courthouse on the basis of their race. Dkt. No. 708. Before the court is plaintiffs' motion for a new trial. Dkt. No. 712. The court held a hearing on the instant motion on October 7, 2016. For the reasons set forth below, the court DENIES the motion for a new trial.

**I.    BACKGROUND**

Plaintiffs Roda and Adil Hiramanek, mother and son, and are no strangers to litigation in state court. As relevant to this order, during divorce proceedings initiated by Adil Hiramanek's ex-wife, the Santa Clara County Superior Court issued a restraining order indicating that Adil Hiramanek could not have contact with his children and declared him a vexatious litigant,

subjecting him to pre-filing review of his papers. *See* Dkt. No. 738, Trial Tr. vol. 3, 75:20-76:17; Dkt. No. 739, Trial Tr. vol. 4, 57:21-58:16; *see also* Cal. Civ. Proc. Code § 391.7. Mr. Hiramanek was involved in other state court matters as well. *See, e.g.*, Dkt. No. 738, Trial Tr. vol. 3, 126:22-127:4, 130:24-131:12. Ms. Hiramanek indicated that she was also involved in state court litigation.

Defendant Beth Miller is a clerk at the California Sixth District Court of Appeal. Plaintiffs testified that during a particular visit to the Sixth District's courthouse in the summer of 2012, they asked Miller for the key to access the restroom. Dkt. No. 738, Trial Tr. vol. 3, 234:17-23. Plaintiffs testified that Miller denied them key to the restroom and made remarks about their race. *Id.* at 235:10-20. Miller denied these allegations. *Id.* at 100:25-101:16. Ms. Miller is white, and plaintiffs are of Asian Indian origin. Dkt. No. 710, Trial Tr. Vol. 1, 142:25-143:1.

Plaintiffs' initial complaint in this matter was filed on January 17, 2013 and asserted claims against the Santa Clara County Superior Court and its judges and staff, among others. Dkt. No. 1. Neither the original complaint, Dkt. No. 1, nor a first amended version, Dkt. No. 37, contained a claim of racial discrimination regarding use of a restroom. Claims against Miller, among other defendants, were not added until plaintiffs filed a "Revised Second Amended Complaint" on May 20, 2014. Dkt. No. 94-1. In total, Mr. or Ms. Hiramanek attempted to assert 48 claims against a multitude of defendants affiliated with the state courts. *Id.* All but two of plaintiffs' claims were stricken, dismissed, or adjudicated in favor of defendants. *See* Dkt. Nos. 19, 98, 546, 570, 708, 711.[1]

Plaintiffs' racial discrimination claim against Miller proceeded to trial on August 2, 2016. During trial, the jury heard testimony from Roda Hiramanek, Adil Hiramanek, and Beth Miller. The jury also heard from plaintiffs' witnesses Ed Summerfield and David Merritt, both of whom claimed they had negative interactions with Miller at the Court of Appeal, and defense witness Lanae Brooks, another clerk at the Court of Appeal. Mr. Hiramanek presented plaintiffs' case. Ms. Hiramanek, who is 86 years old, was only present to testify on August 3, 2016. The bases of Adil

---

[1] Mr. Hiramanek's claim for excessive force against Sheriff's Deputy Plett remains pending, as does his motion to reconsider the court's partial summary judgment ruling in favor of Plett and other Sheriff's Deputies.

and Roda Hiramanek's claims were essentially identical, so the court allowed Mr. Hiramanek to ask questions on behalf of Roda Hiramanek. The parties rested and presented closing arguments on August 5, 2016, and the court instructed the jury on the relevant substantive law and the procedures they were to follow, including, as relevant here, an instruction to base the verdict only on the evidence received in the case and not on outside sources or testimony that was not admitted or was stricken. Dkt. No. 706, Instr. Nos. 2, 3, 11. The case was then submitted to the jury.

Almost immediately after deliberations began, the court received a note from Juror No. 4[2] that read as follows: "I didn't realize that dictionaries were off limits, and looked up vexatious litigation in the dictionary." Dkt. No. 707 at ECF p. 5. The court conferred with the parties outside the presence of the jury. Mr. Hiramanek requested that the juror be excused or that a mistrial be granted. The court denied Mr. Hiramanek's motions. The court responded to the juror's note with the following instruction: "You are instructed to ignore any definition that you looked up and decide the case on the evidence presented. You should not discuss with your fellow jurors what the definition you looked up was." Dkt. No. 707 at ECF p. 5. The jury deliberated for a total of slightly over one hour and reached a verdict in favor of defendant.

Plaintiffs filed the instant motion for a new trial on September 2, 2016. Dkt. No. 712. Defendant filed an initial response characterizing plaintiffs' filing as frivolous and offering a more substantive response at the court's request, Dkt. No. 719. The court ordered a substantive opposition, Dkt. No. 720, which defendant filed on September 22, 2016, Dkt. No. 725. Plaintiff filed a reply on September 29, 2016, Dkt. No. 733.[3] The court held an evidentiary hearing on October 7, 2016 at which Mr. Summerfield and Juror No. 4 testified.

---

[2] The juror's name is omitted from this error to protect his privacy.

[3] Official transcripts of days 3 and 4 of the trial were released on October 3, 2016. Dkt. Nos. 738-739. On October 5, 2016, Defendant filed an amended opposition that was substantively identical to her original opposition but that cited to the official trial transcript instead of the rough trial transcript. Dkt. No. 742. Plaintiffs objected to defendant's amended filing as untimely. Dkt. No. 744. Because the amended opposition makes no substantive changes to defendant's original brief, the amendment does not affect the court's analysis, and the court need not rule on plaintiffs' objection.

## II. ANALYSIS

Plaintiffs move for a new trial under Federal Rule of Civil Procedure 59. Rule 59(a) does not specify the grounds on which a new trial may be granted. Rather, it provides that a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(a). "Historically recognized grounds" for a new trial "include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). The Ninth Circuit has held that "[t]he trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski*, 481 F.3d at 729 (quoting *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n. 15 (9th Cir. 2000)). In at least some circumstances, a court may deny a motion for a new trial where a party did not raise an objection during trial. *See, e.g.*, Fed. R. Civ. P. 51(c), (d) (noting that an objection to a jury instruction is only timely if a party objects before the instruction is delivered to the jury).

Plaintiffs argue that they are entitled to a new trial on numerous grounds. As explained below, only two of plaintiffs' arguments warrant extended discussion.

### A.   Alleged Misconduct by Juror No. 4

Plaintiffs argue that Juror No. 4 was biased against them from the start of the case and that the juror's use of a dictionary definition of "vexatious litigation" irreparably tainted the deliberations. (Argument 1).[4]

#### 1.  Use of Dictionary

Plaintiffs assert that Juror No. 4's consultation of a dictionary requires a new trial. When a party alleges that extraneous evidence has been introduced into jury deliberations, a new trial may be warranted if "there is a reasonable possibility that the material could have affected the verdict." *Sea Hawk Seafoods, Inc. v. Alyeska Pipeline Service Co.*, 206 F.3d 900, 906 (9th Cir. 2000).

---

[4] The argument numbers cited herein are from plaintiffs' motion for a new trial, Dkt. No. 712.

1   "Where extraneous information is imparted . . . the burden is generally on the party opposing a
2   new trial to demonstrate the absence of prejudice." *Id.* The Tenth Circuit's decision in *Mayhue v.*
3   *St. Francis Hosp. of Wichita, Inc.*, 969 F.2d 919 (10th Cir. 1992), cited by plaintiffs, provides a
4   helpful set of considerations that may be relevant in a civil case in analyzing potential prejudice
5   when a jury consults a dictionary or dictionary definition without authorization:

> (1) The importance of the word or phrase being defined to the resolution of the case.
> (2) The extent to which the dictionary definition differs from the jury instructions or from the proper legal definition.
> (3) The extent to which the jury discussed and emphasized the definition.
> (4) The strength of the evidence and whether the jury had difficulty reaching a verdict prior to introduction of the dictionary definition.
> (5) Any other factors that relate to a determination of prejudice.

*Id.* at 924. The court in *Mayhue* affirmed a decision to grant a new trial in a racial discrimination case when the jury obtained dictionary definitions of the words "discriminate" and "prejudice" that were inconsistent with the court's jury instructions. *Id.* at 921.[5]

The instant case is distinguishable from *Mayhue*. In that case, the terms that the jury looked up—"discriminate" and "prejudice"—went to the heart of the plaintiff's discrimination claims. Notably, the Tenth Circuit in *Mayhue* agreed with the district court's conclusion that the jury's research into the definitions of "administer," "clinical," and "hypertension" was insufficient to grant a new trial because those terms were not significant to the plaintiff's racial discrimination claims. *Id.* at 921 n. 3. Here, any research into the definition of "vexatious litigation" was

---

[5] In the criminal context, the Ninth Circuit has listed five factors to consider in adjudicating challenges based on the introduction by a juror of extrinsic material:
> (1) whether the material was actually received, and if so how;
> (2) the length of time it was available to the jury;
> (3) the extent to which the juror discussed and considered it;
> (4) whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and
> (5) any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict.

*Marino v. Vasquez*, 812 F.2d 499, 506 (9th Cir. 1987) (affirming decision to grant habeas relief or new trial to prisoner convicted of murder where jury applied a dictionary definition of "malice" that was inconsistent with court's jury instructions and performed an out-of-court experiment). Of course, criminal cases present issues that are not present in the instant case, including the need to prove guilt beyond a reasonable doubt and a defendant's right to confront accusers.

harmless. The issue of whether Mr. Hiramanek actually was a vexatious litigant was not before the jury. While Mr. Hiramanek's status as a vexatious litigant may have affected his credibility, nothing in the record suggests that the jury did not understand that even a vexatious litigant is entitled to have his case heard in court free from racial discrimination.

Second, unlike in *Mayhue*, the dictionary definition that Juror No. 4 found in the instant case was consistent with the definition presented at trial. At the evidentiary hearing, Juror No. 4 testified that to the best of his recollection, the definition of "vexatious litigation"—which he found in a dictionary saved onto his phone—was "when someone files repeated, frivolous lawsuits." The first time the jury heard that Mr. Hiramanek had been deemed a vexatious litigant was on August 4, 2016. *See* Dkt. No. 738. Trial Tr. vol. 3, 220:1-4. On the last day of trial, plaintiffs' witness David Merritt, who has himself been deemed a vexatious litigant by the state court, agreed with defense counsel's definition of a vexatious litigant:

> Q. You agree that the definition of a vexatious litigant is a person who, in any litigation, while acting in propria persona, repeatedly files unmeritorious motions, pleadings or other papers, conducting unnecessary discovery, or engages in other tactics that are frivolous or solely intended to cause unnecessary delay?
> A. That's one of four prongs. There are three other definitions. You also have the definition that a person who had, within the last seven years, filed -- what is it? -- five unmeritorious lawsuits, which I had not come under. Even the one that you just stated was not -- essentially – I'll let you continue before I answer. But essentially there are additional definitions.
> Q. That is one of the definitions; correct?
> A. That's one of the definitions --
> Mr. Brown: all right. Thank you. No more questions.
> The witness: -- under 393, 391.

Dkt. No. 739, Trial Tr. vol. 4, 181:16-182:8. The definitions presented to the jury are consistent with two of the four possible definitions of "vexatious litigant" provided in California Civil Procedure Code Section 391(b). The definition that Juror No. 4 found—filing repeated, frivolous lawsuits—is consistent with the definitions provided above.[6]

Third, there is no evidence that the jury discussed the definition that Juror No. 4 found. To the contrary, Juror No. 4 testified at the evidentiary hearing that after he read the definition of

---

[6] The jury did not receive a separate instruction from the court defining "vexatious litigant."

"vexatious litigation" found on his phone to other jurors, they did not discuss the meaning of the term. He simply read the definition, and there was no further discussion. Juror No. 4 also testified that he complied with the court's instruction not to discuss the definition with his fellow jurors during deliberations.

Fourth, unlike in *Mayhue*, the Hiramaneks' case was substantively weak, and the jury in the instant case apparently had no trouble reaching a verdict. The *Mayhue* court specifically noted that "prejudice [could] be inferred from the timing of the verdict" because "[t]he jury was able to reach a verdict less than three hours after the foreperson read the definitions, despite having been plagued by 'irreconcilable differences' the night before." 969 F.2d at 926. In the instant case, as explained further below, each of plaintiffs' witnesses had serious credibility problems. The jury in the instant case reached a verdict in slightly over an hour.

Finally, the court notes that the court specifically instructed Juror No. 4 not to consider the dictionary definition or to discuss it with other jurors during deliberations. Juror No. 4 testified that after he received the court's instruction not to discuss the definition he found, he did not say anything else to the jury about the definition. In *Mayhue*, by contrast, the district court specifically denied the jury's request for a dictionary, but the jury looked up the meanings of key words anyway. 969 F.2d at 921. In the instant case, there is no evidence that the jury did not follow this court's instructions.

For the reasons above, the court concludes that plaintiffs are not entitled to a new trial based on Juror No. 4's consultation of a dictionary regarding the meaning of "vexatious litigation."

### 2. Alleged Failure to Disclose Bias

Plaintiffs also move for a new trial based on their claim that Juror No. 4 failed to answer voir dire questions truthfully and failed to disclose that he knew of Mr. Hiramanek's vexatious litigant status prior to trial. Days after trial ended, Mr. Hiramanek asserts, he learned that one of the potential jurors might have learned of his status as a vexatious litigant during jury selection.

In support of this argument, plaintiffs rely on the testimony of Ed Summerfield, one of

7

1  their trial witnesses. Some background on Summerfield is helpful to understand his testimony. At
2  trial on August 4, 2016, Summerfield testified that he was an "entrepreneur" and that he has been
3  "diagnosed with something on the Asperger spectrum." Dkt. No. 738, Trial Tr. vol. 3, 202:12,
4  203:1. Summerfield purportedly met Mr. Hiramanek "in the lines in the courthouses" sometime
5  ago. *Id.* at 204:13. Summerfield testified that on one occasion in 2012 or 2013, he came to the
6  Sixth District courthouse to drop off materials for David Merritt, and that on that occasion,
7  defendant Miller said to Summerfield: "Oh, you're that retarded guy for that nigger." *Id.* at 206:6-
8  25, 207:11-12. Mr. Merritt is black. *Id.* at 210:10-11. Summerfield also testified that he was at the
9  Sixth District courthouse on another occasion, and on that occasion, Summerfield observed
10 defendant deny plaintiffs the use of the restroom key. *Id.* at 207:13-25. Summerfield claimed that
11 defendant told plaintiffs "you don't belong here." *Id.* at 208:4-5. It is clear that the jury did not
12 believe Summerfield's testimony.

13 In support of their motion for a new trial, plaintiffs submitted a declaration from
14 Summerfield. Dkt. No. 712-1 Ex. A. The declaration purports to have been signed on August 7,
15 2016 in San Jose, California. *Id.* at 2. Summerfield declares that while he was waiting outside the
16 courtroom to testify in this case on August 2, 2016, the day of jury selection, he overheard
17 individuals talking. Specifically, he declares: "Another conversation I overheard was a male
18 person explaining the word vexatious to another person, and showing his phone to that other
19 person of what he claimed contained information about a side to the trial being vexatious, and his
20 strong feeling against that side." Dkt. No. 712-1 Ex. A ¶ 7. Summerfield's declaration does not
21 specify the appearance of the person he allegedly heard speaking about the term "vexatious" on
22 August 2, 2016. At the October 7, 2016 evidentiary hearing, however, Summerfield testified that
23 the person he heard speaking about the term "vexatious" on August 2, 2016 was the same person
24 he saw leave the courtroom at the court's instruction when Summerfield was called to testify on
25 October 7, 2016—Juror No. 4.

26 To obtain a new trial on the basis that a juror lied about something during voir dire,
27 plaintiffs must "first demonstrate that [the] juror failed to answer honestly a material question on
28

1   voir dire, and then further show that a correct response would have provided a valid basis for a

2   challenge for cause." *Pope v. Man-Data, Inc.*, 209 F.3d 1161, 1163 (9th Cir. 2000) (quoting

3   *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556 (1984)).

4         Plaintiffs have failed to show that a new trial is warranted because there is no credible

5   evidence that Juror No. 4 knew of plaintiffs or of Mr. Hiramanek's status as a vexatious litigant

6   before trial. At the October 7, 2016 hearing, Juror No. 4 testified that he first heard the term

7   "vexatious" used in connection with this lawsuit during proceedings in court. Juror No. 4 testified

8   that he believed the term "vexatious" came up twice during trial. Juror No. 4 recalled that the first

9   time "vexatious" came up was in passing when someone indicated that Mr. Hiramanek was

10  referred to as vexatious. The second time it came up, according to Juror No. 4, was during Mr.

11  Merritt's testimony. Juror No. 4's testimony is consistent with the trial transcript. *See* Dkt. No.

12  738, Trial Tr. vol. 3, 220:1-4 (defense counsel asking Summerfield on August 4, 2016 if he was

13  aware Mr. Hiramanek was a vexatious litigant in state court); Dkt. No. 739, Trial Tr. vol. 4 176:8-

14  10 (plaintiff asking Merritt on August 5, 2016 to confirm that Merritt was subject to a pre-filing

15  order); *id.* at 181:13-182:8 (Merritt confirming on cross-examination that "vexatious litigant" is

16  another term for people subject to pre-filing orders).

17        The only witness to support plaintiffs' claim that Juror No. 4 knew that Mr. Hiramanek

18  was a vexatious litigant before the presentation of evidence at trial was Summerfield, and

19  Summerfield was simply not credible. At trial, Summerfield's testimony was impeached by the

20  fact that the bathroom incident at issue in this case allegedly occurred in 2012, but Summerfield

21  claimed that he did not tell anyone what had happened until 2016 "because earlier this year, [Mr.

22  Hiramanek] bumped into [Summerfield] in downtown San Jose and [Hiramanek] told

23  [Summerfield] that [Hiramanek had] some kind of a case." Dkt. No. 738, Trial Tr. vol. 3, 211:7-9;

24  *see also id.* at 214:4-9. It seems implausible that Summerfield, having observed defendant

25  discriminate against plaintiffs, would not see Mr. Hiramanek again for nearly four years and then

26  would coincidentally run into Hiramanek and offer to provide testimony in support of

27  Hiramanek's claims. The jury also heard that after Summerfield sued Summerfield's former

28

employer for alleged racketeering violations, Summerfield's attorney withdrew, and he represented himself. *Id.* at 216:4-217:15. These facts suggest that Summerfield might be biased against the state courts. Additionally, Summerfield testified that he would drop off filings at the right-hand filing window at the Sixth District courthouse, *id.* at 217:16-218:1, but a clerk at the Sixth District, Lanae Brooks, testified that the right-hand window was not even used to accept filings during the relevant time period because it did not have a computer, Dkt. No. 739, Trial Tr. vol. 4, 158:2-14.

Summerfield's testimony at the October 7, 2016 evidentiary hearing was no more credible. First, Summerfield admitted that he did not prepare the declaration that he signed and plaintiffs submitted in support of the instant motion, though he did testify that he believes the declaration is accurate. Summerfield did not specify who prepared the declaration. Second, Summerfield claimed to have taken notes regarding his purported observations of conduct of potential jurors on August 2, 2016. Summerfield claimed that he created the notes the evening of August 2 after he got home from court. While Summerfield submitted a copy of his purported notes to the court, Summerfield did not explain why a trial witness such as himself would think to create notes on the conduct of potential jurors. Third, the timeframe for Summerfield's discovery of purported juror misconduct is highly suspect. Mr. Hiramanek claims that he was in contact with Summerfield late on Sunday, August 7, 2016 and then learned what Summerfield saw outside the courtroom on August 2, 2016. Dkt. No. 712-1 (Hiramanek Decl.) ¶ 3. Under questioning from Mr. Hiramanek at the October 7, 2016 hearing, Summerfield testified that a woman Summerfield allegedly heard talking outside the courtroom on August 2, 2016 appeared South American. As part of this comment, Summerfield noted that he attended the Olympics in Rio de Janeiro this year. When asked a follow-up question by defense counsel, Summerfield confirmed that he attended the Olympic opening ceremony this year. The relevance of this point is that Summerfield was present to testify at trial in this case the afternoon of August 4, 2016, and the Olympic opening ceremony was held on August 5, 2016.[7] Moreover, Summerfield purports to have signed his declaration on

---

[7] *See, e.g., Rio Olympics Opening Ceremony: How to Watch, Time, TV Info*, USA Today, Aug. 5,

1  August 7, 2016 in San Jose, California. Dkt. No. 712-1 Ex. A at 3. The court finds it highly
2  implausible that Mr. Summerfield testified in court on Thursday, August 4, 2016, flew to Rio in
3  time for the Olympic opening ceremony on Friday, August 5, and flew back to San Jose to talk to
4  Mr. Hiramanek on Sunday, August 7.[8] Fourth, to the extent that Summerfield identified Juror No.
5  4 as the person he purportedly heard talking about the term "vexatious" on August 2, 2016,
6  Summerfield did not have any other alternatives. The court asked the only two witnesses who
7  would be testifying at the October 7, 2016 hearing—Juror No. 4 and Summerfield—to leave the
8  courtroom together and to come in individually only when called. Summerfield did not pick Juror
9  No. 4 from a lineup.
10  In short, the court finds Summerfield's assertion that Juror No. 4 knew of Mr. Hiramanek's
11  vexatious litigant status before trial to be untruthful. Because there is no credible evidence in
12  support of plaintiffs' claim of juror bias, their motion for a new trial on this ground is denied.

### B.   Introduction of Prejudicial Material

Plaintiffs next argue that defendant introduced unduly prejudicial material at trial in violation of this court's rulings on motions in limine. (Arguments 2, 5, 12). "To receive a new trial because of attorney misconduct in the civil context . . . the moving party must demonstrate adverse counsel's misconduct . . . substantially interfered with the moving party's interest." *S.E.C. v. Jasper*, 678 F.3d 1116, 1129 (9th Cir. 2012) (internal quotation marks and citation omitted). "[T]o warrant reversal on grounds of attorney misconduct, the flavor of misconduct must sufficiently permeate an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict." *Id.* (quoting *Kehr v. Smith Barney, Harris Upham & Co., Inc.*, 736 F.2d 1283, 1286 (9th Cir. 1984)).

Plaintiffs focus their argument on the fact that the jury heard that Mr. Hiramanek: (1) had a

---

2016, http://www.usatoday.com/story/sports/olympics/rio-2016/2016/08/04/2016-rio-olympics-opening-ceremony-schedule-tv-guide/87388434/
[8] The court also notes that Mr. Hiramanek previously argued that it would be prejudicial to conduct the trial the week of August 2, 2016 because one of his witnesses—whom Mr. Hiramanek steadfastly refused to identify—had purchased tickets to Olympic events on August 4, 5, 15, and 17. *See* Dkt. No. 659.

restraining order entered against him denying him access to his children for 50 years; (2) had been declared a vexatious litigant by the state court; and (3) had been accused of forgery by his former attorney. *See* Dkt. No. 712 at 5-10, 12-14. This court had previously ruled that these topics were off limits to defendant under Rule 403 unless plaintiffs opened the door to their introduction. This court's July 8, 2016 order on motions in limine stated, in relevant part:

> It is difficult to see how the adverse rulings against plaintiffs in state court are at all relevant to the issues of defendant's liability or the harm plaintiffs allegedly suffered, and the danger of unfair prejudice and waste of time is considerable. While an order finding that Mr. Hiramanek has made frivolous filings in the past may be somewhat relevant to plaintiff's reputation for truthfulness, introduction of such an order would likely cause the jury to waste time considering the merits of plaintiff's past acts.
>
> ***If, however, plaintiffs rely on state court rulings in support of their damages arguments or for any other purpose, defendants may be entitled to discuss those rulings.*** Moreover, while the court does not expect plaintiffs to argue at trial that defendant's racial prejudice against them motivated defendant to conspire with others to frame criminal charges against Mr. Hiramanek, see Dkt. No. 94-1 ¶ 798, if plaintiffs are allowed to make such an argument, defendant will be entitled to rebut those allegations.

Dkt. No. 658 at 4 (emphasis added).

Plaintiffs' arguments that a new trial is warranted are unpersuasive because in each instance that defendant elicited testimony on one of the potentially prejudicial topics above, plaintiff had opened the door to its introduction. For example, plaintiff alluded to the restraining order depriving him and his mother of access to his children in his opening statement. Dkt. No. 710, Trial Tr. vol. 1, 143:2-3 (Aug. 2, 2016) ("Mrs. Hiramanek, the grandmother, has been deprived of contact with the three grandchildren since years."). Plaintiff's opening statement also mentioned more than once that he had been "dragged" into a divorce. *Id.* at 144:4-5, 144:21-22. At one point, plaintiff asked defendant if she was aware of the "substance" of any case pending before the Court of Appeal, which opened the door to her discussing the restraining order. Dkt. No. 738, Trial Tr. vol. 3, 75:20-76:17. Hiramanek also voluntarily testified: "[M]y ex-wife's counsel, when I was overseas on a business trip, got me kicked out of my house on phony charges." *Id.* at 230:6-8.

Mr. Hiramanek also opened the door to discussion of the vexatious litigant order. In his opening statement, Mr. Hiramanek attempted to explain why he is pro se in this matter. Dkt. No. 710, Trial Tr. vol. 2, 144:9-10 ("And especially in a case like this, you can't get an attorney when your defendant is actually a goliath.") In volunteering this unnecessary explanation, Mr. Hiramanek opened the door to defendant arguing that the real reason Mr. Hiramanek could not get an attorney in this case was his vexatious litigation history. Moreover, after defendant testified about the pre-filing restriction against Mr. Hiramanek—which occurred after Hiramanek refused the court's offers for a limiting instruction regarding adverse state court orders[9]—Hiramanek asked defendant additional questions about the consequences of the pre-filing restriction to establish the number of pending appeals he had. *See* Dkt. No. 738, Trial Tr. vol. 3, 148:22-149:12.

Similarly, Mr. Hiramanek asked a line of questions that he should have seen would lead to discussion of the forgery charges against him and, potentially, the order declaring him vexatious.[10] The forgery charges came up during Mr. Hiramanek's examination of Ms. Miller. The first relevant exchange in which "forgery" appears in the trial transcript is as follows:

> Q. For example, when I asked you a question on what's -- why you have this opinionated, judgmental view of me, you refused to answer; right?
>
> A. I don't think I have a judgmental opinion -- I -- after the forgery incident, I had a judgment towards you. I did when you were forging curt -- Caitlyn Burgess's name on documents. That's where I got the ill will towards you, and I felt that you were mad at me because I had interactions with her. I happened to be the clerk that helped her when she came in to look at the documents you had used her name on.

Dkt. No. 738, Trial Tr. vol. 3, 72:4-13 (Aug. 4, 2016). Plaintiffs correctly point out that later that day, the court remarked that it did not appear that plaintiff had opened the door with that particular question:

> THE COURT: My suggestion on a limiting instruction, and I'll give it to you in a minute, but I want to make a couple of comments first.

---

[9] Mr. Hiramanek rejected three possible limiting instructions the court offered to read to the jury. *See* Dkt. No. 738, Trial Tr. vol. 3, 86:20-87:24, 88:10-89:24, 104:11-25.
[10] Hiramanek subsequently pled guilty to a misdemeanor and the forgery charges were dismissed. Dkt. No. 739, Trial Tr. vol. 4, 82:9-11.

> One is that looking back at the transcript, it really was Ms. Miller that raised the issue and mentioned the forgery proceedings, and I think, based on the in limine rulings, that she should have been strictly instructed to avoid that. I don't think the answer was required by the question.

*Id.* at 104:3-10. At the time of its comment, the court did not have a final transcript for review. Upon review of the complete transcript for that court day, the court finds that Mr. Hiramanek had asked Ms. Miller three times about why she might harbor negative feelings against him before she referred to forgery:

> Q. Okay. Now, in the deposition of November 2015, isn't it true that when you were asked why do you harbor ill will against me, you said, well, and then you answered with a qualified answer; isn't it true?
>
> A. I said I didn't harbor ill will towards you. I told you I don't like what you're doing here, but I didn't harbor ill will back then.

*Id.* at 44:15-21. Later that morning, Mr. Hiramanek elicited the following exchange with Miller:

> Q. In your deposition, you really didn't answer why you have this not positive judgment about me; right?
>
> A. I didn't have any -- I -- I didn't have -- you were a patron of the court. I don't know if you guys -- if you should be called customers, a litigant, an appellant. I guess you would be an appellant. I didn't have any ill will towards you. I think at -- probably in 2012, I felt you were upset with me for something, so I -- I felt leery about being around you.

*Id.* at 69:4-18. Mr. Hiramanek had twice asked Miller questions that referred to why Miller had negative feelings about him at the time of the incident of alleged discrimination. Mr. Hiramanek should not have been surprised when, after he asked a third time "why you have this opinionated, judgmental view of me," Miller responded that she judged Mr. Hiramanek negatively because she believed he had forged a signature on court documents.

      Mr. Hiramanek did not heed the court's warnings that he might not like Miller's answers to questions about her mental state. He instead insisted that he should be able to ask questions about Miller's feelings against him but that she should censor her answers if they involved the criminal charges against him. *See* Dkt. No. 738, Trial Tr. vol. 3, 108:4-15, 109:19-111:15, 122:24-123:7 (Aug. 4, 2016). Mr. Hiramanek voluntarily chose to probe why Miller might have had negative

feelings against him, and he cannot blame her for giving an answer that was inconsistent with his theory that she held racist views. Mr. Hiramanek also refused the court's offer to give a curative instruction once the forgery charges against him were mentioned. *Id.* at 124:18-125:5.

In sum, plaintiffs have not shown that a new trial based on the introduction of prejudicial evidence (either during testimony or during closing arguments) is warranted.

### C. Other Asserted Grounds for a New Trial

Plaintiffs argue that they are entitled to a new trial based on a litany of other grounds, but plaintiffs' arguments lack merit. Plaintiffs assert that defense counsel contacted U.S. Marshals to investigate alleged threats by Mr. Hiramanek on the eve of trial simply to intimidate plaintiff. (Argument 3.) This argument ignores the fact that the day before trial was set to begin, Mr. Hiramanek made a filing that, among other things, compared the way the courts had treated him to the government actions that purportedly motivated Timothy McVeigh to bomb the Oklahoma City federal building:

> No wonder that U.S. citizens, with no prior criminal record, but with legitimate grievances, are left with no choice but to resort to extreme measures, when the legal means of settling disputes against the powerful, the influential state authorities, is frustrated by the very individuals, who are sworn to provide redress of these grievances. See for e.g. *United States v. McVeigh* No. 96-CR-68, 1997 WL 200045 at *2-10 (D. Colo. Apr. 25, 1997) (direct examination of Cynthia Lou Klaver)1. Pltf. does not know all the factual details on McVeigh, and regardless, Pltf. does not endorse, subscribe to, encourage, or condone McVeigh's [an ex. U.S. defense employee] acts. But it would be naïve to ignore that those extreme measures were motivated by, namely the gross failure of the American tradition of handling disputes with proceedings that involve due process. History on this point has repeated itself, time and time again, see recent July 2016 Dallas and other shooting of white police officers. The message throughout history is FRUSTRATING JUSTICE WILL GET YOU NOWHERE! See history of Nelson Mandela, Gandhi, Martin Luther King, et al. "There is a higher court than courts of justice and that is the court of conscience. It supercedes [sic] all other courts", quote from Mahatma Gandhi.

Dkt. No. 697 at 2. As shown above, the filing also sympathized with an individual who killed police officers in Dallas earlier in the summer. *Id.* Mr. Hiramanek had to have expected that when he alluded to one of the worst terrorist attacks in American history, federal security officials would take notice, independent of any action by opposing counsel. If anyone has engaged in intimidation

15
5:13-cv-00228-RMW
ORDER DENYING MOTION FOR NEW TRIAL AGAINST DEFENDANT MILLER

tactics, it is Mr. Hiramanek.

Plaintiffs next claim that a "mole" for the defense somehow tried to convince a witness, David Merritt, not to testify. (Argument 4.) Plaintiffs submit no admissible evidence in support of this claim, nor do they articulate how it supposedly prejudiced them since Merritt testified at trial.

Plaintiffs claim that defendant was improperly allowed to call a "surprise" case in chief witness, Lanae Brooks (Arguments 6 and 15), but plaintiffs ignore the fact that the court only allowed Brooks to testify to impeach the testimony of Ed Summerfield, whose testimony the court was not originally going to allow due to plaintiffs' general lack of disclosure. Dkt. No. 692 at 3.

Plaintiffs claim that the weight of the evidence favored their side (Argument 7), but the court disagrees. When the jury heard in plaintiffs' opening statement that a state court issued an order depriving both plaintiffs of access to Mr. Hiramanek's children, Dkt. No. 710, Trial Tr. vol. 1, 143:2-3 (Aug. 2, 2016), the jury could have reasonably believed that both plaintiffs had a reason unrelated to alleged racial discrimination to strongly dislike the state court system. Each of plaintiff's witnesses was also impeached. Roda Hiramanek provided inconsistent testimony in her deposition and at trial over what racial remarks Miller allegedly made. *See* Dkt. No. 734-1 at ECF pp. 118-122.[11] Moreover, Adil Hiramanek was unable to remember the date of the alleged discrimination incident. Dkt. No. 739, Trial Tr. vol. 4, 72:7-12. *See also* Dkt. No. 738, Trial Tr. vol. 3, 214:4-9 (Summerfield testifying that he did not see Mr. Hiramanek for four years after the alleged incident but randomly encountered him and agreed to testify); Dkt. No. 739, Trial Tr. vol. 4, 176:8-10, 181:13-182:5 (revealing that state deemed David Merritt a vexatious litigant). In short, a reasonable jury could have chosen not to believe anything that plaintiffs or their witnesses said.

Plaintiffs also failed to show prejudice based on their arguments that: there were errors in the jury instructions (Argument 8); plaintiffs received insufficient time to review and object to the jury instructions (Argument 9); the court's verbal instructions were incomprehensible (Argument

---

[11] The court cites the rough transcript of Ms. Hiramanek's testimony only because no party ordered the official transcript from that day of the trial.

10); the "young, foreign-born jury with language deficiencies was ill prepared" (Argument 11); the court scheduled trial at a time when a witness was unavailable (Argument 13); the court made erroneous evidentiary rulings and excluded witnesses (Argument 14); and the jurors were rushed to reach a verdict (Argument 16). Even if plaintiffs had provided sufficient factual support for these arguments (which they did not), plaintiffs have failed to articulate how any of these alleged missteps prejudiced the verdict.[12] As explained above, a reasonable jury could have found that plaintiffs' case simply was not credible. With respect to trial scheduling and evidentiary rulings, plaintiffs are improperly attempting to relitigate this court's prior orders. *See* Dkt. Nos. 649, 679, 692.

Plaintiffs also argue that the court improperly dismissed potential jurors, Cherie Tien and Tin Tran, for cause because they were sympathetic to elders. (Argument 17). A court may dismiss a juror for cause for actual bias. *See, e.g., Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1220 (9th Cir. 1997). On voir dire, Ms. Tien indicated that she has an 81-year-old mother and several relatives with Alzheimer's Disease. When asked about potential bias, Ms. Tien's approximate response was: "I wouldn't say I'm biased, but I might be, you know." She also indicated that it was hard for her to say whether she was predisposed to have her mother's condition or her experience with elderly relatives influence her views of this case. It was appropriate to dismiss her for cause. Mr. Hiramanek actually agreed during jury selection that Tin Tran should be dismissed for cause because Hiramanek was concerned that the juror's English skills were not strong enough. Plaintiff cannot now complain that the court should have left Mr. Tran on the jury. Accordingly, plaintiffs' arguments are unpersuasive.

Finally, plaintiffs argue that the undersigned judge was biased against them and that the court erred by not allowing them to present evidence of this alleged bias. (Argument 18). Even if plaintiffs had presented a legally sufficient basis for recusal—which, as explained in this court's order denying reassignment, they did not, Dkt. No. 249—the question of a judge's qualifications is

---

[12] It is particularly striking that in a racial discrimination case, plaintiffs would attack the supposed foreign origins of the jurors.

not for the jury to decide.

### D. Mr. Hiramanek's Recurring Litigation Misconduct

Even if plaintiffs had shown that they were otherwise entitled to a new trial, the court finds that Mr. Hiramanek's abusive litigation conduct before and during trial precludes the relief plaintiffs seek. The court did not rule on defendant Miller's motion for terminating sanctions on the last day of trial and allowed the case to go to the jury. Trial Tr. vol. 4, 220:5-12; Dkt. No. 705-1 (Trial Log) at 3. A court may sanction a litigant under Federal Rules of Civil Procedure 16(f), 37(b)(2)(A), and 41(b). *See Malone v. U.S. Postal Serv.*, 833 F.2d 128, 130 (9th Cir. 1987). A district court weighs five factors in determining whether to dismiss a case for failure to comply with a court order:

> (1) the public's interest in expeditious resolution of litigation;
> (2) the court's need to manage its docket;
> (3) the risk of prejudice to the defendants;
> (4) the public policy favoring disposition of cases on their merits; and
> (5) the availability of less drastic sanctions.

*Malone*, 833 F.2d at 130 (citation omitted). Reviewing the record, the court finds that a sanction of dismissal would have been proper.

In this case, the scope of Mr. Hiramanek's litigation misconduct was vast. Some of Mr. Hiramanek's sanctionable conduct is described above. Among other things:

1.   The court allowed Mr. Hiramanek to participate in the final pretrial conference by phone because Mr. Hiramanek represented to the court that a disability precluded him from attending hearings in person. *See, e.g.*, Dkt. Nos. 237, 661. When he needed to exchange materials with opposing counsel, however, Mr. Hiramanek stated on the record that he could be at the courthouse within minutes of the pretrial conference's completion. Dkt. No. 681 at 93:2-12, 96:21-22, 101:15-22, 103:9-14. Federal Rule of Civil Procedure 16(f) allows a court to sanction a party for failure to appear at a pretrial conference.

2.   During trial, Hiramanek repeatedly ignored the court's instructions to only present material relevant to the racial discrimination claim to be tried. Instead, in Mr. Hiramanek's opening statement alone, he showed inflammatory and irrelevant slides alleging that: (a) the

California court system was engaged in racketeering; (b) defendant Miller engaged in discovery abuses; (c) this court's rulings were unfair to plaintiffs; (d) defendant Miller also violated the Americans with Disabilities Act; and (e) this court was engaged in a "cover up" to protect the state court defendants. Dkt. No. 725-1 Ex. A at 5, 6, 9-11, 16, 19; *see also* Trial Tr. vol. 3, 79:17-80:18 (alleging state court corruption during examination of Miller). Mr. Hiramanek's argument that the jury never saw these slides because he skipped over them while he displayed the PowerPoint presentation that contained them on a projector is unpersuasive. What the court believes occurred is that Mr. Hiramanek quickly clicked through the inflammatory slides such that these slides were displayed to the jury, albeit only for a short time. Even if Mr. Hiramanek only momentarily displayed the inflammatory slides, he repeatedly stated during trial that there was material that the court would not allow him to present. *E.g.*, Dkt. No. 710, Trial Tr. vol. 1, 143:19-22; Dkt. No. 738, Trial Tr. vol. 3, 231:2-6. Mr. Hiramanek thus repeatedly tried to persuade the jury to decide in his favor based on inadmissible material.

3. During Mr. Hiramanek examination of defendant and in his closing, he improperly tried to introduce a portion of a discovery order in this case that said, without context, that defense counsel's representations to the court had been incomplete. Dkt. No. 738, Trial Tr. vol. 3, 159:19-160:15; Dkt. No. 739, Trial Tr. vol. 4, 229:17-25. Hiramanek knew that this order was not admitted into evidence and willfully ignored the court's ruling. *Id.*

4. In his closing argument, as well, Mr. Hiramanek ignored the fact that the court had sustained defendants' objections to his arguments and proceeded to present irrelevant, inflammatory material to the jury. For example, Mr. Hiramanek: asserted that he had other witnesses whose testimony the court did not allow him to present, Dkt. No. 739, Trial Tr. vol. 4, 218:15-24; 219:11-16; claimed that Miller influenced orders of the state Court of Appeal, *id.* at 222:6-13; referred to "outside news and trends on racial discrimination," *id.* at 223:4-16; and claimed that the state court had deprived an unnamed mother in the courtroom of access to her child, *id.* at 225:24-226:4.

Mr. Hiramanek's constant misconduct delayed the resolution of this case and expended

judicial resources that the court could have used on other matters. Furthermore, Mr. Hiramanek litigated in bad faith.[13] As shown above, plaintiff's trial presentation was designed to have the jury decide against defendant based on matters that were wholly irrelevant to his claims of racial discrimination. While public policy favors a disposition of a case on the merits, the court warned Mr. Hiramanek multiple times that he was presenting irrelevant, inflammatory material to the jury. The court also warned that the case might be dismissed well before Mr. Hiramanek delivered his closing. *See* Dkt. No. 738, Trial Tr. vol. 3, 257:7-9 (the court's warning Mr. Hiramanek that "I think there's been great liberality, or indulgence with you, and I think you're lucky that this case still is surviving."). In light of plaintiffs' *in forma pauperis* status, monetary sanctions would not be an effective remedy in this case.

Because a sanction of dismissal would have been appropriate, even if plaintiffs had presented otherwise adequate grounds for a new trial, their motion would be moot.

## III. ORDER

For the foregoing reasons, the court DENIES plaintiffs' motion for a new trial.

**IT IS SO ORDERED.**

Dated: October 31, 2016

_____
Ronald M. Whyte
United States District Judge

---

[13] The jury could have reasonably questioned Mr. Hiramanek's motivations in suing Miller. On cross examination, Mr. Hiramanek testified that he added Miller—a court clerk—to his complaint only after he learned that the judges he previously sued were immune to suit. Trial Tr. vol. 4, 134:6-13.